Rebecca L. Davis (State Bar No. 271662)
E-mail: rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Barak Kamelgard (State Bar No. 298882)
E-mail: barak@lawaterkeeper.org
Benjamin Harris (State Bar No. 313193)
E-mail: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401-2385
Tel: (310) 394-6162

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California nonprofit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>WYATT PRECISION MACHINE, INC., a California corporation,<br><br>Defendant. | Case No. 2:23-cv-3309<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("LA Waterkeeper" or "Plaintiff"), a California nonprofit corporation, by and through its counsel, hereby alleges:

COMPLAINT                                        1

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On December 15, 2022, Plaintiff provided notice of Defendant WYATT PRECISION, MACHINE, INC.'s ("Wyatt Precision" or "Defendant") violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of LA Waterkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.      This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 3301 E. 59th Street in Long Beach, California ("Facility"). These discharges and related procedural, planning, and reporting omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2014-0057-DWQ and as further amended November 6, 2018 ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.      Plaintiff alleges that the Facility's storm water discharges onto 59th Street, where it then flows west into Los Angeles municipal storm drains, then discharges into Los Cerritos Channel, which flows into Alamitos Bay (collectively "Facility Receiving Waters").

8.      Los Cerritos Channel and Alamitos Bay are ecologically robust areas and are important habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and

recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Cerritos Channel and Alamitos Bay waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

9. The Los Cerritos Channel and Alamitos Bay are impaired with, among other pollutants, zinc. Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of Los Cerritos Channel and Alamitos Bay and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

III.   PARTIES

10. Plaintiff LOS ANGELES WATERKEEPER is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Santa Monica, California. Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation. LA Waterkeeper and its members are deeply concerned with protecting the environment in and around their communities, including the Los Angeles River Watershed. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11. LA Waterkeeper has members living in the communities near the Facility, Los Cerritos Channel and Alamitos Bay Watersheds. They enjoy using the Los Cerritos Channel and Alamitos Bay for recreation and other activities. Members of LA

Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of LA Waterkeeper use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

12. LA Waterkeeper brings this action on behalf of its members. LA Waterkeeper's interest in reducing Defendant's discharges of pollutants into the Los Cerritos Channel and Alamitos Bay and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of LA Waterkeeper.

13. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

14. Defendant WYATT PRECISION, MACHINE, INC. is a California corporation that owns and/or operates the Facility.

## IV. STATUTORY BACKGROUND

### A. Clean Water Act

15. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

17.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

18.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**B.     General Permit**

19.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water

to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including Los Cerritos Channel and Alamitos Bay for zinc.

20.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

21.     The General Permit contains several prohibitions. Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit § V.A. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. General Permit § III.C. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit §§ VI.A, III.D

22.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

23.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I(1).

24.     Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit § X.H. The General Permit requires a

comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

25.     The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet § I(2)(o).

26.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit § X.H.4-5.

27.     A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, §

X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit § X.G.2. A Facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

28.    The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensures that best management practices ("BMPs") are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

29.    Under the General Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), Oil & Grease ("O&G") , pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

30.    Facilities are required to make monthly visual observations of storm

water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

31.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

32.     The General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." *Id*., § § XI.A.2.c.

33.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial

storm water discharges and authorized NSWDs." After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

34.    The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

35.    The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants discharged by Wyatt Precision, including: zinc – 0.26 mg/L; and aluminum– 0.75 mg/L.

36.    The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs. General Permit § XII.A.  An exceedance of an annual NAL occurs when the average of the analytical results for a pollutant obtained for all samples at the entire facility during a single reporting year is greater than the pollutant's annual NAL.  The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range (for pH). General Permit, § XII.A.2.

37.    If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on

July 1 following the reporting year during which the exceedance occurred.  General Permit § XII.C.

38.     By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation.  General Permit § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via the State Water Board's Storm Water Multiple Application and Report Tracking System ("SMARTS")a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

39.     If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII.D. For Level 2 Status, a discharger is required to submit an Exceedance Response Action ("ERA") Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit § XII.D.

**C.     Basin Plan**

40.     The Regional Board has identified beneficial uses and established water quality standards for Los Cerritos Channel and Alamitos Bay in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

41.     The beneficial uses of these waters include, among others, commercial and sport fishing, navigation, estuarine habitat, marine habitat, wetland habitat, wildlife habitat, rare, threatened, or endangered species, migration of aquatic organisms, shellfish harvesting, spawning, reproduction, and/or early development, water contact recreation, and noncontact water recreation. Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

42.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

43.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

44.     The EPA has adopted saltwater numeric water quality standards for zinc of 0.09 mg/L (Criteria Maximum Concentration – "CMC") and for copper of 0.0048 (CMC).  40 CFR 131.38 (California Toxics Rule).

45.     The EPA 303(d) List of Water Quality Limited Segments lists Los Cerritos Channel as impaired for zinc, ammonia, pH, trash, indicator bacteria, copper,

lead, chlordane (sediment), and Bis(2ethylhexyl)phthalate (DEHP), among other pollutants. *See* https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2018_integrated_report.html. Alamitos Bay is impaired for indicator bacteria and oxygen, dissolved, among other pollutants. *See id.*

46. Effective July 1, 2020, the General Permit establishes an Instantaneous Maximum NEL of 0.0956 mg/L for zinc and 0.0098 mg/L for copper being discharged into Los Cerritos Channel. General Permit, Attachment E, Table E-2, p. 35.

47. An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value. General Permit, Attachment C at 5.

48. Section XX.B.1 of the General Permit requires discharges to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL in Attachment E. They are required to perform the following actions:

(i) Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented;

(ii) Assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI); and

(iii) Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: additional BMPs and/or SWPPP

implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E); or no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E). *Id.*, § XX(B)(1).

49.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

50.     The Facility manufactures hydraulic fittings and other machine parts that are custom ordered primarily by the aerospace, defense, and commercial industries stores, among other activities, in Long Beach, California.

51.     Plaintiff is informed and believes, and thereupon alleges that, on or around January 2, 2020, Defendant filed a Notice of Intent with the State Board, enrolling the Facility in the General Permit.

52.     Plaintiff is informed and believes, and thereupon alleges that Defendant has operated the Facility since prior to January 2, 2020.

53.     The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 4 19I028490.

54.     The Facility's NOI lists the Facility's SIC codes as 3451 (Screw Machine

Products) and 3452 (Bolts, Nuts, Screw, Rivets, and Washers).

55.     The Facility's NOI lists the Facility size as 36,050 square feet, and lists 19,425.3 square feet as being industrial areas exposed to storm water.

56.     A significant portion of the Facility operates outdoors. The outside areas of the Facility wrap around three sides of the building. The outdoor areas are used for metal turning recycling storage and forklift and vehicle traffic, among others. The surface of these outdoor areas collects metallic flakes, chips, and dust that is tracked outdoors by vehicle traffic, foot traffic, and wind, and from metal turning recycling storage, among other activities.

57.     Plaintiff alleges that the Facility collects and discharges storm water from its 36,050 square foot site through at least two discharge locations.

58.     The Facility's SWPPP indicates the Facility has two storm water discharge locations, labeled S1 and S2 on the Facility's SWPPP Map. S1 is located at the southeast corner of the Facility and accepts runoff from the eastern portion of the Facility including areas with forklift and vehicle traffic and metal turning recycling storage. S2 is located at the southwest corner of the Facility and accepts runoff from the majority of the Facility's outdoor vehicle traffic and metal turning recycling storage.

59.     Los Cerritos Channel and Alamitos Bay are both waters of the United States.

60.     Plaintiff alleges that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with the manufacture, storage, delivery, and transporting of hydraulic fittings and other machine parts.

61.     Plaintiff alleges that storm water flowing over these areas collects metals and other pollutants as it flows towards the storm water discharge locations.

62.     Plaintiff alleges that all storm water discharges from the Facility contain

storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

63.     Plaintiff alleges that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

64.     The levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively. On December 14, 2021, the level of zinc measured in the storm water sample collected by Plaintiff at location S1 was 0.37 mg/L. On March 28, 2022, Defendant measured zinc in storm water discharged from the Facility at location S1 of 0.55 mg/L. That level of zinc is more than twice the EPA annual NAL value for zinc. The average of all zinc measurements taken at the Facility during the 2021-2022 Reporting Year was 0.28 mg/L, which exceeds the annual NAL for zinc.

65.     The levels of zinc in storm water detected by the Facility have exceeded the saltwater numeric water quality standard for zinc of 0.09 mg/L established by EPA in the California Toxic Rule. On December 14, 2021, the level of zinc measured in the storm water samples collected by Plaintiff at locations S1 and S2 were 0.37 mg/L and 0.1 mg/L, respectively. On March 28, 2022, Defendant measured zinc in storm water discharged from the Facility at locations S1 and S2 of 0.55 mg/L, and 0.11 mg/L, respectively.

66.     The levels of aluminum in storm water detected at the Facility have exceeded the annual NAL for aluminum of 0.75 mg/L established by the State Board. On December 14, 2021, the level of aluminum measured in the storm water samples collected by Defendant at discharge location S1 was 0.98 mg/L and at discharge location S2 was 1.2 mg/L. On March 28, 2022, Defendant measured aluminum in storm water discharged from the Facility at location S1 of 1.1 mg/L and at location S2 of 1.7 mg/L. The average of all aluminum measurements taken at the Facility during

the 2021-2022 Reporting Year was 1.25 mg/L, which exceeds the annual NAL for aluminum.

67.  Plaintiff alleges that the Facility exceeded the applicable total instantaneous maximum NEL for zinc during the 2021-2022 Reporting Year.

68.  On December 14, 2021, the level of zinc measured in the storm water samples collected by Plaintiff at locations S1 and S2 were 0.37 mg/L and 0.1 mg/L, respectively. On March 28, 2022, Defendant measured zinc in storm water discharged from the Facility at locations S1 and S2 of 0.55 mg/L, and 0.11 mg/L, respectively. All of these levels exceed the NEL limitation of 0.0956 mg/L for zinc.

69.  Plaintiff is informed and believes, and thereupon alleges, that storm water discharges have occurred from the Facility on the dates listed in Attachment A of Exhibit A.

70.  On information and belief, Plaintiff alleges that since at least March 3, 2018, Defendant has failed to implement BAT and BCT at the Facility for its discharges of zinc, aluminum, and other potentially un-monitored pollutants.  Effluent Limitation V.A of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. A Facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges

associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32. As of the date of this Complaint, Defendant has failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

71.     On information and belief, Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and CMC values demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards.

72.     Plaintiff alleges, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

73.     Since March 3, 2018, Plaintiff alleges that Defendant has taken only five samples of storm water from the Facility. The only samples taken by Defendant were on December 14, 2021, March 28, 2022, November 8, 2022, January 5, 2023, and February 24, 2023. The samples taken on November 8, 2022 were only from location S1.

74.     Plaintiff is informed and believes, and thereupon alleges, that local precipitation data shows that discharges occurred on days since March 3, 2018 during which the Facility was open but storm water samples were not collected by the Facility. *See* Notice Letter, Attachment A.

75.     Plaintiff alleges, that Defendant has failed and continues to fail to collect storm water discharge samples from all QSEs as required by Section XI.B.3 of the General Permit as follows:

- Failure to collect and analyze two samples from all outfalls during the second half of the 2019-2020 reporting year.
- Failure to collect and analyze two samples from all outfalls during the first half of the 2020-2021 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2020-2021 reporting year.
- Failure to collect and analyze a second sample from all outfalls during the first half of the 2021-2022 reporting year.
- Failure to collect and analyze a second sample from all outfalls during the second half of the 2021-2022 reporting year.
- Failure to collect and analyze two samples from all outfalls during the first half of the 2022-2023 reporting year.

76.    The General Permit mandates that each sample be analyzed for pH. General Permit § XI.B.6.

77.    Only the samples taken on January 5, 2023 and February 24, 2023 include the pH of the Facility's storm water discharge samples.

78.    The General Permit mandates that each sample also be analyzed for "[a]dditional parameters identified by the Discharge on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (Section X.G)." *Id*., § XI.B.6.2.

79.    The Facility's SWPPP indicates that "copper from tire thread ware and brake pads … can accumulate throughout the outdoors," and is likely to be present at the Facility.

80.    None of the reports or documentation submitted to SMARTS by Wyatt Precision include sampling storm water discharges from the Facility for copper. Plaintiff alleges that Defendant has failed to analyze storm water discharges from the Facility for copper in violation of Storm Water Permit Section XI.B.6. since at least March 3, 2018.

81.    Plaintiff alleges that Defendant has not conducted sampling event visual inspection during the last five years.

82.     Plaintiff alleges that Defendant has not conducted any dry weather visual inspections during the last five years.

83.     Plaintiff alleges that Defendant has not maintained records of any visual observations required by the Permit. Plaintiff is further informed and believes and thereupon alleges, that Defendant has not maintained any records of any visual observations required by the General Permit including the date, time and location of any observations, the presence or probable source of any observed pollutants, the name of the person conducting the inspection, or any response actions taken.

84.     The General Permit requires each discharger to "[d]evelop and implement management procedures to ensure that appropriate staff implements all elements of the SWPPP, including the Monitoring Implementation Plan…." General Permit, § X.H.1.g.i. Dischargers also must "[d]evelop a method of tracking and recording the implementation of BMPs identified in the SWPPP…." *Id*., § X.H1.g.ii. In addition, dischargers must "[m]aintain the BMP implementation records, training records, and records related to any spills and clean-up related response activities for a minimum of five (5) years. Plaintiff is informed and believes that Defendant has not developed a means to track the implementation of BMPs or maintained any implementation or training records.

85.     Plaintiff alleges that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the General Permit.

86.     Plaintiff alleges that the SWPPP fails to contain procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable.

87.    Plaintiff alleges that the Facility's fails to identify areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in the storm water discharge in compliance with Section V.A of the General Permit.

88.    Plaintiff alleges that the Facility's SWPPP fails to implement required advanced BMPs and fails to identify and justify each minimum BMP or applicable BMP not being implemented at the Facility.

89.    Plaintiff alleges that Defendant has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants and exceedances of applicable NALs and NELs.

90.    Plaintiff alleges, that at least since June 20, 2022, the Facility has failed to assess the Facility's BMPs and to revise its SWPPP within 90 days of conducting the Annual Evaluation for the 2021-2022 Reporting Year, during which the Facility's sampling results indicated NAL exceedances for zinc and aluminum. The Facility's Annual Report for the 2021-2022 Reporting Year does not identify any revisions made to the SWPPP despite NAL exceedances for these pollutants. The Annual Report for the 2021-2022 Reporting Year fails to provide a sufficient explanation of the Facility's failure to take steps to reduce or prevent high levels of pollutants, including but not limited to zinc and aluminum which were measured at levels in the Facility's storm water above the annual NAL. Defendant's failure to assess the Facility's BMPs and to report revisions to the SWPPP negates a key component of the evaluation process required in self-monitoring programs such as the General Permit.

91.    Plaintiff alleges that Defendant has failed to update the Facility's SWPPP in response to the Level 1 ERA Report submitted to SMARTS since its initial SWPPP was submitted in December 2018.  For example, the Facility's Level 1 ERA Report submitted on January 3, 2022, set forth specific BMP and SWPPP revisions necessary to prevent future NAL exceedances and indicated that revisions would be documented

1    in the SWPPP's amendment log. However, the SWPPP has not been updated to reflect
2    the updated BMPs.

3        92.    Plaintiff alleges that Defendant has also failed to revise the Facility's
4    SWPPP with applicable NEL exceedance information, and also failed to certify and
5    submit the revised SWPPP to SMARTS. General Permit § VII.C.3.

6        93.    Information available to Plaintiff indicates that as a result of these
7    practices, storm water containing excessive pollutants is being discharged from the
8    Facility during rain events into Los Cerritos Channel and Alamitos Bay.

9        94.    Plaintiff is informed and believes, and thereupon alleges, that Defendant
10   has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs
11   consistent with the General Permit. Information available to Plaintiff indicates that
12   Defendant has not fulfilled the requirements set forth in the General Permit for
13   discharges from the Facility due to the continued discharge of contaminated storm
14   water.  Plaintiff is informed and believes, and thereupon alleges, that all of the
15   violations alleged in this Complaint are ongoing and continuous.

16   **VI.    CLAIMS FOR RELIEF**

17                          **FIRST CAUSE OF ACTION**
18              **Failure to Implement the Best Available and**
                 **Best Conventional Treatment Technologies**
19       **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

20       95.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if
21   fully set forth herein.

22       96.    The General Permit's SWPPP requirements and Effluent Limitation
23   V(A) require dischargers to reduce or prevent pollutants in their storm water
24   discharges through implementation of BAT for toxic and nonconventional pollutants
25   and BCT for conventional pollutants. Defendant has failed to implement minimum
26   BMPs, advanced BMPs, and BAT and BCT at the Facility for their discharges of zinc,

aluminum, and other potentially un-monitored pollutants in violation of Effluent Limitations V.A and X.H of the General Permit.

97.    Each day since March 3, 2018, that Defendant has failed to develop and implement minimum BMPs, advanced BMPs, and BAT/ BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

98.    Defendant has been in violation of the BMP and BAT/BCT requirements every day since at least March 3, 2018. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Exceedance of Numeric Effluent Limitations**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

99.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

100.    Defendant has discharged storm water from the Facility, as set forth above, in violation of General Permit § V.C.

101.    Each day that storm water discharged from each discrete monitoring point at the Facility exceeded the NEL for zinc for the second time during a Reporting Year is a separate and distinct violation of General Permit § V.C.

102.    Defendant's violations will continue each day it discharges levels of zinc in violation of the effluent limitations of the General Permit and the Clean Water Act.

103.    Each and every violation of Effluent Limitation V.C of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**THIRD CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

104.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

105.   Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

106.   Plaintiff is informed and believes, and thereupon alleges, that since at least March 3, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for zinc and aluminum in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

107.   Plaintiff is informed and believes, and thereupon alleges, that since at least March 3, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for zinc and aluminum in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

108.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with zinc, aluminum, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water from the Facility flows untreated into the Los Angeles County Storm Drain System. Plaintiff is

informed and believes that storm water from the Facility flows through the municipal storm drain system and into Los Cerritos Channel, which flows into Alamitos Bay.

109. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

110. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation VI.B of the General Permit.

111. Every day since at least March 3, 2018 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### FOURTH CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

113. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

114. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continues to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

115. Defendant has failed to develop and implement an adequate SWPPP for

the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*:

    a. Defendant's failure to identify minimum BMPs at facility;

    b. Defendant's failure to identify advanced BMPs at facility; and

    c. Defendant's failure to identify procedures for alternate team members.

    d. Defendant's failure to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

116. Defendant has failed to conduct an Annual Comprehensive Facility Compliance Evaluation and update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring as required by Sections XV, XVI, and VII of the General Permit.

117. Each day since March 3, 2018, that Defendant has failed to conduct an Annual Comprehensive Facility Compliance Evaluation and develop, implement, and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

118. Defendant has been in violation of the Permit's SWPPP requirements every day since March 3, 2018. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**<u>FIFTH CAUSE OF ACTION</u>**
**Failure to Develop and Implement an**
**Adequate Monitoring Implementation Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

119. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

120. The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting

program (including, *inter alia*, sampling and analysis of discharges).

121. Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility. General Permit, §§ X(I), XI. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*:

    a. Defendant's failure to conduct required sampling and analysis;

    b. Defendant's failure to conduct and record visual observations during sampling event(s);

    c. Defendant's failure to conduct monthly visual observations and explain their omission;

    d. Defendant's failure to maintain records of all visual observations; and

    e. Defendant's failure to analyze storm water samples for copper and pH.

122. Each day since at least March 3, 2018, that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## SIXTH CAUSE OF ACTION
### Failure to Perform Water Quality-Based Corrective Actions
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

123. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

124. Defendant is required to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL.

125.   Defendant has failed to conduct the required Facility evaluations, failed to properly assess the Facility's SWPPP, and failed to submit the required documentation to SMARTS.

126.   Every day since March 3 2018, that Defendant has failed to complete the required water quality-based corrective actions in a violation of Section XX.B.1 of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

127.   Defendant has been in violation of the General Permit's water quality-based corrective action requirements every day since March 3, 2018. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past

1  monitoring violations;

2         g.  Order Defendant to prepare a SWPPP for the Facility consistent with

3  the General Permit's requirements and implement procedures to regularly review and

4  update the SWPPP;

5         h.  Order Defendant to provide Plaintiff with reports documenting the

6  quality and quantity of their discharges to waters of the United States and their efforts

7  to comply with the Act and the Court's orders;

8         i.  Order Defendant to pay civil penalties of up to $59,973 for violations

9  occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act,

10  33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

11         j.  Order Defendant to take appropriate actions to restore the quality of

12  waters impaired or adversely affected by their activities;

13         k.  Award Plaintiff's costs (including reasonable investigative, attorney,

14  witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

15  § 1365(d); and,

16         l.  Award any such other and further relief as this Court may deem

17  appropriate.

18  Dated: May 2, 2023                    Respectfully submitted,

19

20

21                              By:    /s/ *Rebecca L. Davis*
                                       Rebecca L. Davis
22                                     LOZEAU DRURY LLP
23                                     Attorneys for Los Angeles Waterkeeper

24

25

26

27

28